IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MONA MANCHANDA,               )
                              )
        Plaintiff,            )
                              )
            v.                )        1:14cv1339 (JCC/TCB)
                              )
HAYS WORLDWIDE, LLC, *et al.*, )
                              )
        Defendants.           )

## M E M O R A N D U M   O P I N I O N

This matter came before the Court on Defendants Hays Worldwide, LLC and David Hays' (collectively "Defendants") motion for summary judgment.  [Dkt. 43.]  Plaintiff Mona Manchanda filed this wrongful death action as personal representative of the estate of Eena Singh Karras ("Karras"). Plaintiff alleges that Defendants' negligence caused Karras to drown during an instructional scuba dive that Defendants supervised.  For the reasons set forth below, the Court will deny Defendants' motion.

### I.   Background

The following facts are taken from the parties' Local Rule 56(B) statements and are undisputed[1] unless otherwise

---

[1]        For ease, undisputed facts are referred to by "SOF" without a party designation.

1

indicated.  (*See* Defs.' Stmt. of Facts ("SOF") [Dkt. 44] at 3-15; [Dkt. 45] at 16.)

In 2012, Defendant David Hays, together with his wife Janet, owned and operated Splash Dive Center.[2]  (SOF ¶ 1.)  Through this dive shop, Hays had certified over 400 scuba divers under the Professional Association of Diving Instructors ("PADI") Open Water Diver curriculum.  (*See* Pl.'s Hays Dep. [Dkt. 48-7] at 128.)  This curriculum requires students to complete classroom "knowledge development" sessions, "confined water dives" in a pool, and four "open water dives."  (SOF ¶¶ 3, 12-13.)

Anticipating an anniversary trip to the Caribbean, Eena Karras and her husband Thomas registered for a PADI Open Water Diver course at Splash Dive Center in March 2012.  (SOF ¶ 15.)  Within a month, Karras and Thomas completed the classroom sessions and confined-water dives, leaving only four open-water dives left before their PADI certification.  (SOF ¶¶ 12-13.)  They set aside a weekend in May 2012 to complete these four dives at Lake Rawlings, Virginia.  (SOF ¶ 15.)

Lake Rawlings is actually a quarry that has been converted into a popular dive site.  (*Id.*)  The underwater landscape has many features for dive training, like submerged

---

[2]     Splash Dive Center was the business name for Defendant Hays Worldwide, LLC.  (SOF ¶ 1.)  This opinion uses the two names interchangeably to refer to Defendant Hays Worldwide, LLC.

platforms for practicing buoyancy control, and items for divers to tour, like sunken boats, cars, and even a plane.  (Dive Map [Dkt. 46-11].)  The conditions at Lake Rawlings on that May weekend "were optimum or near optimum" for diving and there was "excellent light in the water in order for divers to see."  (SOF ¶ 20; Defs.' Hays Dep. [Dkt. 46-6] at 149-50.)

Defendant Hays met Karras, Thomas, and four other students at the lake on Saturday morning, May 26, 2012, to instruct the first open-water dive.  (SOF ¶ 18.)  Hays began, in accordance with PADI standards, by pairing the six students into three buddy teams and briefing them on the dive.  (SOF ¶ 21.)  The briefing included an equipment check, a buddy safety check, a description of the skills to be performed on the dive, and a buoyancy check.  (SOF ¶¶ 21-23; Defs.' Hays Dep. [Dkt. 46-6] at 47-48.)  The students completed the Saturday dives according to plan.  (Defs.' Hays Dep. at 51.)  The only notable incident on Saturday occurred at the end of the afternoon dive when Karras experienced some panic, forcing her to surface. (Pl.'s Mem. in Opp'n ¶ 4.)  Karras' husband followed her and learned that she "got scared and a little confused."  (Pl.'s Thomas Dep. [Dkt. 48-1] at 75.)  Hays joined the two at the surface and told Karras she could either rejoin the group or swim to shore early. (*Id.*)  According to Thomas, Karras elected to swim to shore early.  (Pl.'s Mem. in Opp'n ¶ 5.)  Hays, however, recalls that

3

Karras rejoined the group and completed the dive.  (Defs.' Hays Dep. at 52-54.).  Regardless of this discrepancy, the Saturday-afternoon dive ended without any other problems.

The focus of this case concerns the third dive, which began before noon on Sunday, May 27, 2012.  (SOF ¶ 25.)  Before the dive, Hays led the students through the same safety checks and briefings as on the prior day, including checking "buoyancy, the air supply, the regulators, the weight configuration, weight releases and then a final locating themselves in their buddy teams."  (SOF ¶¶ 29, 31; Defs.' Hays Dep. at 70.)  The dive plan required students to tour a sunken boat at a depth of 35-40 feet.  (SOF ¶ 29.)  Karras expressed some concern to Hays about the depth, asking if it was necessary for her to dive to 40 feet.  (Defs.' Hays Dep. at 68-69.)  Hays explained that the course required diving to this depth, but that she could elect not to dive or could call off the dive "at any time for any reason and not expect any ill repercussions."  (*Id.* at 67-69.) Karras decided to participate in the dive and paired in a buddy group with her husband Thomas.  (SOF ¶ 32.)

After some preliminary buoyancy drills and navigation trainings at shallow depths, Hays led the ground toward the sunken boat for a tour.  (*Id.*)  The boat was perched on a ledge 35 or 40-feet down a steep rock wall that continued to drop below the ledge to the bottom of the lake.  (SOF ¶ 33.)  During

the tour of the boat, Karras had trouble maintaining consistent buoyancy. (Pl.'s Thomas Dep. at 108.)  Thomas testified that he and Karras both became positively buoyant during the tour, meaning they floated toward the surface. (*Id.*)  Despite these buoyancy problems, Hays testified that all six students successfully ascended from touring the sunken boat and regrouped at around 15-feet deep for a three-minute safety stop. (SOF ¶ 35.)

Sometime during the safety stop, Hays lost sight of Karras. (*Id.*)  No one, including Thomas and Hays, saw how Karras became separated from the group. (SOF ¶ 41.)  Hays remembers noticing Karras when he glanced up from the countdown timer on his dive computer sometime during the second minute of the stop. (Defs.' Hays Dep. at 102.)  But when he looked up forty-five to seventy seconds later, Karras was gone. (*Id.;* SOF ¶ 41.)  Hays signaled for the group to surface where he learned that no one knew where Karras was. (SOF ¶ 36; Defs.' Hays Dep. at 103.)  Hays then ordered the group to swim to shore so he could search for the missing Karras. (SOF ¶¶ 37-38.)

Hays first searched for Karras on the surface, but he could not see her. (SOF ¶ 38.)  He then retraced the dive underwater, but to no avail. (*Id.*)  Eventually, other divers around the lake were recruited to aid the search. (*Id.*)  Over an hour after anyone had seen Karras alive, one of the recruited

divers found her 57-feet deep at the bottom of the steep wall
and unresponsive.  (*Id.* ¶ 39; Dive Data [Dkt. 48-3] at 3-5.)
Divers pulled her body to a dock where medical professionals
present at the lake began administered rescue procedures.  (SOF
¶ 39.)  When EMS arrived, they could not get a pulse from
Karras.  (*Id.* ¶ 40.)  A helicopter came to transport her to the
nearest hospital with a hyperbaric chamber, but she flat-lined
in flight.  (*Id.*)

Plaintiff alleges that these facts prove Defendants
were negligent in several ways, including negligently
supervising Karras during the dive, ineffectively assisting
Karras once rescue was necessary, rendering inadequate care
after she was removed from the lake, improperly equipping
Karras, understaffing the dive, failing to have proper rescue
equipment at the lake, and inadequately training Splash Dive
Center employees.  (*See* Pl.'s Compl. ¶ 18; Pl.'s Mem. in Opp'n
[Dkt. 48] at 14-15.)  In a prior motion, Defendants moved to
dismiss this case for failure to sufficiently allege any
proximate cause between Defendants' negligence and Karras'
drowning.  [Dkt. 3.]  Defendants also asserted the affirmative
defenses of assumption of risk and pre-injury waiver of
liability.  The Court denied Defendants' motion, finding that
Plaintiff satisfied the plausibility pleading standard and that
Defendants' affirmative defenses were not yet fit for

consideration.  [Dkt. 16.]  Similarly, in the present summary judgment motion, Defendants argue that proximate causation is lacking and Karras assumed the risk of death.  Because reasonable jurors could reach different conclusions on these issues, the Court will deny that motion.

## II.  Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial").  Importantly, the non-moving party must show more than some metaphysical doubt as to the material facts.  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth

7

specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)).

When reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  Where there is conflicting evidence, the court must credit the evidence of both sides and acknowledge that there is a genuine issue of material fact that cannot be resolved by summary judgment.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868-69 (2014) (stating that summary judgment is inappropriate where each side has put forward competent evidence that raises a dispute about a material fact).

### III. Analysis

**A.        Proximate Cause**

To succeed on her Virginia common law negligence claim,[3] Plaintiff must prove (1) the existence of Defendants' legal duty; (2) a breach of that duty; (3) the breach was the proximate cause of injury; and (4) resulting damages. *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 624 S.E.2d 55, 62 (Va. 2006). Of these prima facie elements, Defendants currently contest only the existence of proximate cause. According to Defendants, the facts only show purported negligence followed by an accident, without any causation connecting the two. They further argue that Plaintiff has not disproven the possibility that several intervening causes could have led to Karras' drowning, such as a heart attack, unconsciousness, or lung damage. (Defs.' Mem. in Supp. at 25-26.) For the following reasons, the Court finds these arguments unavailing.

Under Virginia's "long accepted definition," the "proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that

---

[3]        All of the injuries alleged in this case occurred within Virginia. Thus, the Court applies Virginia law to this state cause of action. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) ("Under Virginia law, the rule of lex loci delicti, or the law of the place of the wrong, applies to choice-of-law decisions in tort actions.").

event would not have occurred." *Ford Motor Co. v. Boomer*, 736 S.E.2d 724, 728 (Va. 2013) (quoting *Wells v. Whitaker*, 151 S.E.2d 422, 428 (Va. 1966)).  This definition encompasses concepts of both factual, or but-for, causation, *see id.* ("We said in *Wells* that the first element of proximate cause, causation in fact, is 'often described as the 'but for' or *sine qua non* rule.")', and of the directness or continuity between the negligence alleged and the plaintiff's injuries, *see e.g.*, *Wagoner v. Commonwealth*, 756 S.E.2d 165, 175 (Va. Ct. App. 2014) ("[T]he concept of proximate cause 'excludes from the scope of liability injuries that are too remote, purely contingent, or indirect[]." (quoting *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011) (Roberts, C.J., dissenting))); *see also Ford Motor Co.*, 736 S.E.2d at 728 ("Proximate cause has been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct.").

Proximate causation is a fact-intensive inquiry that ordinarily requires resolution by a jury.  *See Phillips v. Se. 4-H Educ. Ctr., Inc.*, 510 S.E.2d 458, 460-61 (Va. 1999).  A plaintiff, however, must present sufficient evidence to "remove the case out of the realm of speculation and conjecture."  *Id*.  In this case, Plaintiff has presented sufficient evidence for a

reasonable jury to find that Defendants' negligence proximately caused Karras' death by drowning.

The Virginia Supreme Court's jurisprudence on lifeguard negligence lends a helpful analogy to this case. *See Phillips*, 510 S.E.2d at 461; *Blacka v. James*, 139 S.E.2d 47, 51 (Va. 1964). Under that precedent, it may be inferred that the causal chain between negligent supervision and a swimmer's death involves two links. First, some sign of distress must have been present that would have put a non-negligent lifeguard or supervisor on notice that a swimmer was in peril. *C.f. Phillips*, 510 S.E.2d at 461 ("A lifeguard's duty is twofold. 'First, he has some duty to observe swimmers for signs of distress; second, he has some duty at some point to attempt to rescue those in distress.'" (quoting *S&C Co. v. Horne*, 235 S.E.2d 456, 459 (Va. 1977)). Second, a non-negligent supervisor must then have been able to prevent the drowning through appropriate action. *Id.* The Court finds that a reasonable jury could find that this causal chain is present here.

Looking at the first link, it is reasonable to conclude that Hays would have recognized Karras' dangerous situation if he was directly supervising her.[4] The Court notes

---

[4]        At this stage, the concept of appropriate "direct supervision" is not defined. But Defendants' expert witness, Dr. Keith David Sawatzy, defined direct supervision as ranging from "physically being able to reach out and grab the student at

at the outset that no one on the dive saw how Karras became separated from the group.  Thus, no one can testify as to whether she gave a distress signal, produced a concerning amount of bubbles, or made any other movements that might have signaled trouble.  (*See* Galambos Dep. [Dkt. 48-4] at 43 (affirming that no "witness statement or other evidence shows that she panicked").)  In *Blacka v. James*, the Virginia Supreme Court found proximate cause lacking as a matter of law in a drowning case because the swimmer made no observable signs that would have alerted a lifeguard to his peril.  139 S.E.2d 47, 51 (Va. 1964).  The child in *Blacka* drowned in a small lake where 300-500 other people were swimming, but "not one of them saw the James boy in any difficulty whatever or heard any cry of distress."  *Id.*  The court noted that "[l]ifeguards are to aid those in distress, and unless there is some cause to believe that one is in distress they cannot be expected to act."  *Id.*  Although no one can testify as to whether Karras gave signals of distress, her separation from the group indicated peril in a way that was not possible in *Blacka*.

Unlike in *Blacka*, Hays' underwater supervision would have allowed him to evaluate Karras' condition based on her depth alone.  The maximum target depth for this dive was 35-40

_____

any point in time, to being aware of where the students are but certainly not necessarily so close that you could grab them."  (Sawatzky Dep. [Dkt. 48-6] at 23.)

feet.  (SOF ¶ 29.)  And at the time Karras is believed to have disappeared, the students were treading water around 15-20 feet deep.  (Defs.' Hays Dep. at 98.)  Despite the target depth, Karras' dive computer shows she was 57-feet deep when air stopped flowing from her regulator.  (*See* Dive Data [Dkt. 48-3] at 4.)  One expert concluded from this dive computer data that Karras was still alive when she was at least 45-feet deep. (Sawatzky Dep. at 30.)  By Hays' own testimony, seeing Karras outside of the target depth range would have caused him to react.  (Pl.'s Hays Dep. at 126-27.)  Hays would have signaled Karras if he saw her at 30 feet and immediately would have swum after her if he saw her at 47 feet.  (*Id.* 126-27.)  From this, a reasonable jury could conclude that Karras' depth would have alerted a non-negligent instructor of her need for help as she descended away from the group.

Even if Hays had observed Karras at an alarming depth, the causal chain also requires that he could have then prevented her drowning.  A reasonable jury could have found this second link through the testimony of Hays and Defendants' expert.  In his deposition testimony, Hays described the action he would have taken if he had seen Karras at an inappropriate depth. (Pl.'s Hays Dep. at 127-28.)  First, he would have first given Karras a signal to ascend.  (*Id.* at 127.)  Then, if she did not comply with the signal, he would have swum to her to make

13

physical contact, assess her responsiveness, and perform a rescue maneuver, if necessary. (*Id.* at 127-28.) Hays also testified that he would have "immediately gone down and grabbed her BCD and escorted her up to the top of the ledge" if he saw Karras at 47 feet. (*Id.*) It is arguable whether Hays could have successfully performed a rescue from this depth, given that a safe ascent rate for the rescue of a non-responsive diver is 30 feet-per-minute. (Pl.'s Hays Dep. at 128.) But, an expert gave his opinion that Karras was both alive and conscious at least two minutes after Hays last saw her. (Sawatzky Dep. at 23.) From this, a reasonable jury could conclude that direct supervision would have alerted Hays to Karras' situation and he could have swum to her rescue in time to prevent her drowning.

Defendants argue that *Phillips v. Southeast 4-H Educational Center, Inc.*, should lead the Court to find no proximate cause here. In *Phillips*, the Virginia Supreme Court affirmed a trial court decision that, as a matter of law, there was no proximate cause connecting two lifeguards' negligent rescue to a swimmer's drowning. 510 S.E.2d 458, 461 (Va. 1999). The swimmer in *Phillips* was standing in the shallow end of a pool after swimming laps while holding his breath. *Id.* at 459. The lifeguards then watched the swimmer dip back underwater and sit on the pool bottom, sending bubbles to the surface. *Id.* When the bubbles eventually stopped, one of the lifeguards

14

jumped in "within moments." *Id.* The lifeguard pulled the swimmer out of the water, but he had no pulse and CPR could not resuscitate him. *Id.* at 459-60. The court found proximate cause lacking because there was no indication when the swimmer's pulse stopped. *Id.* at 461. Without that evidence, it remained speculative whether a non-negligent rescue would have presented anything more than "an undefined 'good chance' of recovery." *Id.* Unlike in *Phillips*, Karras' entire dive was monitored by her dive computer which recorded her dive time, air usage, and depth. (*See* Dive Data [Dkt. 48-3] at 3-5.) This information, when interpreted by an expert, arguably creates a timeline of Karras' breathing that permits the reasonable conclusion that Hays could have saved Karras with non-negligent supervision.

In addition to adequately proving factual causation, Plaintiff has shown Hays' negligent supervision was a sufficiently direct cause of Karras' death. A medical examiner listed the cause of death as drowning. (SOF ¶ 42.) There was no medical evidence of a superseding injury or physical event that would have caused the drowning. The medical examiner also found no evidence of a lung injury common to divers who ascend too quickly.[5] Furthermore, Karras' equipment was found to be in

---

[5]    The Court acknowledges that the rescue procedures may have prevented the medical examiner from discovering evidence of lung injury. (*See* SOF ¶ 42; Posthumus Dep. [44-13].) The Court's function at summary judgment, however, is not "to weigh

"perfect" working order.  (SOF ¶ 43.)  Thus, a reasonable jury could find that the drowning was a natural and continuous injury resulting from Defendants' negligence.

In conclusion, Plaintiff has presented sufficient evidence of both factual causation and directness of injury to remove the question of proximate cause from the realm of speculation.  Therefore, the Court will deny Defendants' motion for summary judgment on this ground.

The Court now turns to Defendants' second argument, that Karras' assumption of risk should bar her claim.

B.      **Assumption of Risk**

Under Virginia law, "a person's voluntary assumption of the risk of injury from a known danger operates as a complete bar to recovery for a defendant's alleged negligence in causing that injury."  *Thurmond v. Prince William Prof'l Baseball Club, Inc.*, 574 S.E.2d 246, 249 (Va. 2003).  A defendant may prevail on this defense by proving the plaintiff (1) fully appreciated the nature and extent of the risk; and (2) voluntarily incurred that risk.  *Burns v. Washington Metro. Area Transit Auth.*, No. 1:12-cv-123, 2012 WL 2878250, at *2 (E.D. Va. July 12, 2012).  The focus of this analysis is on the risk alleged to have caused the injury, not merely the risk inherent in an activity.  *See*

---

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

*Amusement Slide Corp. v. Lehmann*, 232 S.E.2d 803, 820 (Va. 1977) (finding plaintiff assumed general risk of amusement slide but did not assume risk of employee inattention, "which was the risk here involved").  This is a subjective inquiry into what the particular plaintiff fully appreciated, not what a reasonable person would have known.  *See id.* at 818 ("[T]he standard primarily to be applied to [assumption of risk] 'is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates.'").  "The defense of assumption of risk ordinarily presents a jury question."  *Thurmond*, 574 S.E.2d at 249.

Defendants argue Karras assumed the risk of panic and drowning by entering the water for her third dive after signing two Assumption of Risk Agreements ("Agreements") and completing the PADI instructional sessions and confined-water dives. (Defs.' Mem. in Supp. at 19-23.)  The Agreements purport to release Defendants from liability for "any injury, death, or other damages" occurring "as a result of the negligence of any party."  (SOF ¶ 4.)  Furthermore, the Agreements state that Karras "expressly assume[s]" all risks of injury.  (*Id.*) Plaintiff responds by arguing that the Agreements are void under Virginia's public policy against waivers of personal-injury liability.  (*See* Pl.'s Mem. in Opp'n at 13-14 (citing *Hiett v. Lake Barcroft Cmty. Ass'n, Inc.*, 418 S.E.2d 894 (Va. 1992).)

17

Furthermore, Plaintiff argues the Agreements did not inform Karras of the risks of Defendants' negligence.  (*Id.* at 14-15.) For the following reasons, the Court concludes that the evidence presented does not establish that Karras assumed the risk of Defendants' negligence as a matter of law.

The shortcoming in Defendants' evidence is that it demonstrates Karras knew the general risks of scuba diving, but not that she fully appreciated the risk of diving in conditions allegedly made more dangerous by Defendants' negligence. Plaintiff has alleged many forms of negligence that Defendant does not contest at this stage, including: negligently training and supervising Splash Dive Center employees; inadequately supervising the dive; failing to rescue; rendering negligent care after Karras was removed from the lake; and providing an insufficient number of dive instructors.  (*See* Pl.'s Mem. in Opp'n at 14-15.)  These acts of negligence allegedly exacerbated the inherent risks of scuba diving.  Karras must have fully appreciated and voluntarily encountered these heightened risks for her claim to be barred.  *See Amusement Slide Corp.*, 232 S.E.2d at 820 (looking to specific negligence alleged to have caused injury).  Based on the evidence presented, it is genuinely disputed whether she appreciated those risks.

The Agreements Karras signed are evidence of the risks she knew before participating in the dive, but they are not

18

conclusive.   Virginia public policy will not permit the Court to view these Agreements as decisive evidence that Karras expressly assumed the risk of Defendants' negligence.   In *Hiett v. Lake Barcroft Community Ass'n, Inc.*, the Virginia Supreme Court ruled that an entry form in which a triathlete purported to "release and forever discharge any and all rights and claims for damages" was void as against public policy.   418 S.E.2d 894, 895 (Va. 1992).   This policy extended from 100 years of Virginia precedent establishing that "provisions for release from liability for personal injury which may be caused by future acts of negligence are prohibited 'universally.'"   *Id.* at 896 (quoting *Johnson's Adm'x v. Richmond & Danville R.R. Co.*, 11 S.E. 829 (Va. 1890)).

As in *Hiett*, the Agreements in this case attempt to release Defendants from liability for personal injury resulting from their future acts of negligence.   In relevant part, the Agreements state the following:

> I understand and agree that neither my instructor(s), . . . the facility through which I receive my instruction, . . . nor PADI Americas, Inc., . . . may be held liable or responsible in any way for any injury death or other damages to me, my family, estate, heirs or assigns that may occur as a result of my participation in this diving program or as a result of the negligence of any party, including the Released Parties, whether passive or active.

In consideration of being allowed to
participate in this course . . . I hereby
personally assume all risks of this program,
whether foreseen or unforeseen, that may
befall me while I am a participant in this
program including, but not limited to, the
academics, confined water and/or open water
activities.

. . . .

I *Eena Sighn/Thomas Karras*, BY THIS
INSTRUMENT AGREE TO EXEMPT AND RELEASE MY
INSTRUCTORS,

*All Splash Dive Center Instructors and
Staff*, THE FACILITY THROUGH WHICH I RECEIVE
MY INSTRUCTION,

*Splash Dive Center*, AND PADI AMERICAS, INC.
AND ALL RELATED ENTITIES AS DEFINED ABOVE,
FROM ALL LIABILITY OR RESPONSIBILITY
WHATSOEVER FOR PERSONAL INJURY, PROPERTY
DAMAGE OR WRONGFUL DEATH HOWEVER CAUSED,
INCLUDING BUT NOT LIMITED TO THE NEGLIGENCE
OF THE RELEASED PARTIES, WHETHER PASSIVE OR
ACTIVE.

(SOF ¶ 4.)  This Court recognizes that some state courts have

found nearly identical contract language to be conclusive

evidence of a scuba diver's assumption of the risk of death

during a diving course.[6]  In those states, however, public policy

---

[6]      *See, e.g.*, *Boyce v. West*, 862 P.2d 592, 598 (Wash. Ct.
App. 1993) ("Mr. Boyce's express assumption of all risks
associated with his enrollment in the scuba diving course bars a
claim for recovery."); *Mann v. Wetter*, 785 P.2d 1064, 1066 (Or.
Ct. App. 1990) (affirming partial summary judgment in scuba
negligence case due to release agreement); *Madison v. Superior
Court*, 203 Cal. App. 3d 589, 600-02 (Cal. Ct. App. 1988)
(finding defendant expressly assumed risk of "[t]he negligence
of the defendants in failing adequately to supervise" during
scuba course through signed waiver); *see also Marshall v. Blue
Springs Corp.*, 641 N.E.2d 92, 98 (Ind. Ct. App. 1994) (finding

did not prohibit a defendant from limiting liability for his own
negligence.[7]  In Virginia, by contrast, public policy voids the
release provisions of these agreements.  To interpret the
Agreements as conclusively establishing Karras' express
assumption of the risk would conflict with this policy.

        Although parts of the Agreements are void, this Court
interprets Virginia policy to permit the admission of other
parts of the Agreements as evidence of Karras' knowledge of the
dangers of scuba diving.  At least one other court has admitted
a similar agreement as evidence of assumption of risk, despite
the *Hiett* public policy.  *See Poston v. Skewes*, No. 2:00-cv-129,
2001 WL 1478661 (W.D. Va. Nov. 21, 2001), *aff'd*, 49 F. App'x 404
(4th Cir. 2002).  In *Poston*, a hunter sought damages for
injuries he suffered as a passenger in a vehicle that crashed
into a ditch on a private hunting reserve.  *Id.* at *3.  Prior to
getting into the vehicle, the hunter signed an agreement in
which he released defendants from any claims of future

---

waiver released defendant from liability for plaintiff's
slipping on dock during scuba class).

[7]        *See Boyce*, 862 P.2d at 597 ("Upholding the release of
Gonzaga does not violate public policy."); *Mann*, 785 P.2d at
1066 ("[T]here are no public policy considerations that prevent
a diving school from limiting liability for its own
negligence."); *Madison*, 203 Cal. App. 3d at 598 ("[W]e perceive
of no reason why Ken could not validly execute such a broad
agreement."); *Marshall*, 641 N.E.2d at 95 ("As a general rule,
parties are permitted to agree in advance that one is under no
obligation of care for the benefit of the other, and shall not
be liable for the consequences of conduct which would otherwise
be negligent.").

negligence. *Id.* at *6 n.3. The agreement also stated that the hunter assumed all risks, including the dangers of "traversing plowed or cultivated fields . . . [or] ditches . . . . [and] com[ing] into contact with . . . holes in the ground and other obstructions or hazards which may or may not be easily seen." *Id.* at *6. The *Poston* court interpreted *Hiett* to allow the agreement into evidence, but only after redacting the language purporting to waive defendant's liability. *Id.* at *6 n.3.

In another post-*Hiett* case, *Haga v. L.A.P Care Services, Inc.*, the court considered whether to admit into evidence an agreement describing the terms of admission to an adult-care home. No. 1:01cv105, 2002 WL 1754485, at *3 (W.D. Va. July 29, 2002). The agreement contained a "provision arguably waiving any future negligence by the defendant" that was void under *Hiett*. *Id.* Because the waiver "may be relevant to the duties of the defendant," however, the court admitted a redacted copy of the waiver into evidence. *Id.* These post-*Hiett* cases indicate that an agreement with void releases may still be admissible as evidence for an alternative legal purpose.

The *Hiett* decision itself also supports this conclusion. While reviewing Virginia's history of cases discussing waivers, the *Hiett* court discussed the case of *Nido v. Ocean Owners' Council*, 378 S.E.2d 837 (Va. 1989). *See Hiett*,

244 Va. at 195 (referencing *Nido*).  In *Nido*, the Virginia
Supreme Court enforced a release of property-damage liability,
even though the same contractual sentence also waived personal-
injury claims.  *Nido*, 378 S.E.2d at 838.  Additionally, when
considering the breadth of *Hiett*, the Virginia Supreme Court has
invoked the principle that "courts are adverse to holding
contracts unenforceable on the ground of public policy unless
their illegality is clear and certain."  *Estes Express Lines,
Inc. v. Chopper Exp., Inc.*, 641 S.E.2d 476, 478 (Va. 2007).  In
light of these cases and policies, the Court concludes that
parts of the Agreements are admissible as evidence of what
Karras knew about the dangers of scuba diving.

Having determined that parts of the Agreements are
admissible, the next question is which parts.  It is not
presently necessary for the Court to parse each line of the
Agreements to separate the permissible language from the void.[8]
It suffices to note that the Court's admission of these
Agreements will be guided by the dual concerns motivating
*Hiett*'s prohibition of personal-injury liability waivers: (1)
those waivers bar a party suffering personal injury "from
seeking recovery from the tortfeasor"; and (2) may diminish a
released party's "motivation to exercise ordinary care to

---

[8]      The Court will rule on evidentiary motions regarding
the Agreements as this case proceeds toward trial.

prevent harm to the releasing party . . . because the possibility of legal liability is removed." *Estes Express Lines*, 641 S.E.2d at 479.  These policies indicate that language purporting to assume the risk of future negligence is not consistent with *Hiett*, while language discussing the general risks inherent in an activity is not problematic.  Thus, for the purpose of this summary judgment motion, the Court views the Agreements as evidence that Karras knew scuba diving was "physically strenuous" and could lead to panic, heart attack, hyperventilation, or drowning.[9]

The additional evidence Defendants rely upon to prove Karras assumed the risk of drowning includes the PADI instructional course and Karras' prior dives.  Like the Agreements, the PADI classes reinforced the general risks of diving.  Those classes, however, did not teach Karras anything about diving under the dangerous conditions that Defendants' negligence allegedly created at Lake Rawlings.  Hays was not the instructor of the classroom or confined-dive sessions and those sessions occurred at times and locations different from the

---

[9]    The Agreement stated, in part, "I also understand that skin diving and scuba diving are physically strenuous activities and that I will be exerting myself during this program, and that if I am injured as a result of heart attack, panic, hyperventilation, drowning or any other cause, that I expressly assume the risk of said injuries . . . ."  (SOF ¶ 4.)

open-water dives.  In sum, the Agreements and PADI course informed Karras of only the inherent risks of scuba diving.

Furthermore, there is a genuine dispute as to what Karras' learned about Defendants' alleged negligence during her dives at Lake Rawlings.  Repeated and voluntary exposure to the same risk is strong evidence that a plaintiff assumed that risk. *See Burns v. Washington Metro. Area Transit Autho.*, No. 1:12-cv-123, 2012 WL 2878250, at *2 (E.D. Va. 2012), *aff'd,* 503 F. App'x 214 (4th Cir. 2013) (granting summary judgment on assumption of risk, in part, because plaintiff used same icy staircase three days in a row before slipping); *Rhea v. Horn-Keen Corp.*, 582 F. Supp. 687, 692 (W.D. Va. 1984) (granting summary judgment, in part, because plaintiff assumed risk of racetrack's negligence by previously racing on same track and signing assumption of risk form).  Defendants in this case, however, have not sufficiently shown that the same allegedly negligent conditions that caused Karras' death on Sunday existed during the dives on Saturday.  A reasonable juror could conclude from the evidence in this case that Hays' supervision on Saturday and during the beginning of the Sunday dive was not negligent at all.  On the second Saturday dive, Karras once panicked and swam to the surface under her own power.  Her dive buddy and Hays soon joined Karras at the surface to check on her condition. Furthermore, on Sunday, Hays once prevented Karras from sinking

25

down a ledge by reaching out and inflating her buoyancy control device.  (SOF ¶ 34.)  These facts could lead a reasonable jury to conclude that Karras actually felt well supervised under Hays' care, rather than exposed to the increased risks that allegedly caused her death.  Thus, there remains a genuine factual dispute as to what risks Karras fully appreciated before she entered the water on that tragic Sunday.

In conclusion, genuine factual disputes remain as to whether Karras assumed the risk of drowning due to Defendants' negligence and whether Defendants' negligence proximately caused Karras' death.  Summary judgment is not a proper method for resolving those disputes.

### IV.  Conclusion

For the reasons set forth above, the Court will deny Defendants' Motion for Summary Judgment.

An appropriate order will follow.

/s/

October 8, 2015                     James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE

26